IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HALL STREET ASSOCIATES, L.L.C., )
a Washington limited liability company, )
                                                    )
           Plaintiff,       )    Civil No. 00-355-JO
                                                    )
    v.                       )    <u>OPINION AND ORDER</u>
                                                    )
MATTEL, INC., a Delaware corporation; ET AL., )
                                                    )
          Defendants.     )

   Michael A. Cohen
   James M. Finn
   SCHWABE WILLIAMSON & WYATT, P.C.
   1600-1900 Pacwest Center
   1211 S.W. Fifth Avenue
   Portland, OR 97204

    Attorneys for Plaintiff

   Kristin M. Kellet
   Shirley M. Hufstedler
   Peter Hsiao
   MORRISON & FOERSTER, L.L.P.
   555 West Fifth Street, Suite 3500
   Los Angeles, CA 90013

Marc D. Blackman
RANSOM BLACKMAN, L.L.P.
1001 S.W. Fifth Avenue, Suite 1400
Portland, OR 97204

Attorneys for Defendants

JONES, Judge:

This action is before the court on remand from the Ninth Circuit Court of Appeals. Specifically, the appellate court instructs this court to confirm the original arbitration award unless grounds exist under the Federal Arbitration Act, 9 U.S.C. §§ 10 and 11, to vacate, modify, or correct the award. See Kyocera Corp. v. Prudential-Bache Trade Servs., Inc., 341 F.3d 987 (9th Cir. 2003)(en banc).

In February 2005, I invited the parties to submit their objections, if any, to confirmation of the original award. Plaintiff submitted objections and defendant responded. Having considered the parties' arguments and for the reasons stated below, I once again vacate the original arbitration award.

## PROCEDURAL HISTORY

Plaintiff Hall Street Associates brought this action against defendants Mattell, Inc., and its predecessor (together, "defendant") for indemnification arising out of a lease agreement. The issues were submitted to an arbitrator in December 2001, who found generally in favor of defendant and awarded fees and costs. On April 29, 2002, I granted plaintiff's motion to vacate the arbitrator's findings and conclusions and remanded the action to the arbitrator for further consideration. On remand, the arbitrator found in favor of plaintiff, awarded costs and fees, and entered a declaratory judgment in plaintiff's favor. Both plaintiff and defendant moved for

review and modification of the second arbitration award. On May 1, 2003, I granted plaintiff's motion, granted in part and denied in part defendant's motion, and awarded plaintiff judgment in the sum of $484,031.12, plus attorneys' fees of $252,065.32 and costs of $74,011.05.

Meanwhile, in 2003, the Ninth Circuit decided Kyocera, which limited the scope of judicial review of arbitral awards to those grounds allowed under the Federal Arbitration Act ("FAA"). Based on that new interpretation, on January 18, 2005, the Ninth Circuit vacated my April 29, 2002, decision, which vacated and remanded the original arbitration award.

## FACTUAL BACKGROUND

This case originally involved several disputes between a landlord and tenant over the tenant's obligations under a lease agreement. Plaintiff owns the property at issue, located at 8585 S.W. Hall Boulevard, Beaverton, Oregon ("Property"). Defendant leased the premises from plaintiff until May 31, 2001. As relevant to these continuing proceedings, plaintiff contends that defendant is liable for cleanup of environmental contamination at the Property, and defendant contends it qualifies for an exception to liability under the contract.

History

The relevant history surrounding the Property dates back more than 50 years, when Sawyers, Inc., owned the Property and began a toy manufacturing facility on the site.[1] GAF corporation acquired Sawyers in 1967, and continued the toy manufacturing operations. GAF eventually sold the Property to View-Master in 1981, which operated a similar toy facility on the site. In 1983, View-Master sold the Property to Western International Properties, but then leased

---

[1]At that time, the Property was separated into three parcels: parcels 1, 2, and 3. The parcel relevant to this action is parcel 1.

it back from Western to continue its operations. In 1984, Western subdivided the Property and sold the relevant parcel to John Eyler. Eyler then conveyed the Property to Cascade Square Associates in 1985. In 1989, while View-Master was still leasing the Property, View-Master was acquired by Tyco.[2] Defendant acquired Tyco in 1997. Finally, in 1998 Cascade transferred its ownership interest in the Property to plaintiff.

The Lease Agreement

On March 5, 1991, View-Master entered into a Lease Agreement ("Lease") with Cascade Square Associates, pursuant to which Cascade Square Associates agreed to lease the premises to View-Master. The Lease provided that View-Master would lease the property for commercial purposes for a term of approximately six years. Because View-Master and its predecessors had used the Property and operated facilities there for many years, View-Master was more familiar with its condition. Consequently, the Lease provided that with certain limited exceptions, View-Master would indemnify Cascade for any activities undertaken by it or its predecessors on the Property.

On April 29, 1996, Cascade Square Associates and View-Master executed an amended lease ("Amended Lease"), which was substantially similar to the 1991 lease. After acquiring Tyco, defendant became the tenant under the Amended Lease. Defendant terminated the Amended Lease on May 31, 2001.

---

[2]Tyco refers collectively to Tyco Industries, Inc., Tyco Manufacturing Corporation and Tyco Toys, Inc.

4 - OPINION AND ORDER

Environmental Issues on the Property

In 1950, a well and water tower were installed on the Property to supply water to the facility. Thereafter, between 1951 and 1980, Sawyers and GAF used trichloroethene ("TCE") in the toy manufacturing operations. While most of the work with TCE was done on the surrounding areas and not on the Property, Sawyers/GAF did dispose of sanitary wastes through a septic tank and drainfield located at the north end of the Property. There is no evidence that any party used TCE in any operations on the Property after 1981. It is undisputed that neither defendant nor any of its predecessors, however, ever tested the well water, groundwater or shallow soils for contaminants on the Property.

In March 1998, plaintiff commissioned SECOR, an environmental consultant, to test the Property's well water for pollutants. SECOR discovered that the water contained TCE levels that far exceeded the federal maximum allowable level. Upon this discovery, the Oregon Department of Environmental Quality ("DEQ") began investigating the contamination and planning remedial measures. The DEQ investigation revealed additional contaminants, including petroleum hydrocarbons, cyanide, chromium and silver. Contamination was found on the Property as well as adjacent parcels, in the well water, the shallow soil, the groundwater and the deep aquifer underlying the Property. Upon discovery of the extensive contamination at the site, defendant shut down the well.

In November 1998, defendant and GAF entered into a consent order with DEQ, pursuant to which GAF agreed to investigate the environmental conditions of the Property and defendant agreed to provided public outreach and communication to its employees. As part of the site investigation, the DEQ performed a risk assessment to evaluate the levels of contaminants and

5 - OPINION AND ORDER

the dangers they posed. The risk assessment identified current and future risks at the site: (1) unacceptable risk from TCE in the deep aquifer underlying the Property, if that source is used for drinking water; and (2) unacceptable risk from TCE in the drainfield area, primarily faced by trench workers performing excavation in that area who may be exposed to shallow groundwater. In addition, petroleum hydrocarbons were identified in the soil located under certain buildings on the Property. The DEQ found that the hydrocarbons posed no threat so long as the buildings remain, but noted that if the buildings were ever removed, the hydrocarbons in the soil would require treatment.

Plaintiff filed this action on March 10, 2000, raising three issues: (1) whether defendant legitimately terminated the Amended Lease on May 31, 2001; (2) whether defendant was obligated to indemnify plaintiff for costs related to environmental cleanup; and (3) whether defendant was obligated to indemnify plaintiff for expenses incurred in defending itself against third party lawsuits. The first issue was resolved following a bench trial on April 27, 2001. The remaining issues were resolved in an arbitration held in December 2001. The arbitrator found in favor of defendant, concluding that it was not obligated to indemnify plaintiff for either environmental cleanup or third party lawsuits.

In reference to environmental cleanup, the arbitrator determined that defendant, Tyco, and View-Master had been in compliance with "applicable environmental laws" and were therefore

excepted from liability under the Amended Lease.³ The arbitrator then ordered plaintiff to pay defendant costs and fees incurred litigating the action.

This Court's 2002 and 2003 Decisions

On February 2, 2002, plaintiff filed a motion to vacate, modify, and/or correct the arbitrator's findings and award. In keeping with the scope of review set forth in the parties' arbitration agreement, I reviewed the arbitrator's findings of fact for substantial evidence and his conclusions of law for error.⁴ Under those standards, I found that the arbitrator erred as a matter of law in concluding that the Oregon Drinking Water Quality Act ("ODWQA"), was not an "applicable environmental law" within the meaning of Sections 12c and 13a of the Amended Lease. On April 29, 2002, I remanded the case to the arbitrator for reconsideration consistent with my ruling.

On remand, the arbitrator found defendant in violation of the ODWQA as an applicable environmental law, and designated plaintiff the prevailing party. I affirmed that decision on

---

³Sections 12(c) of the Lease provides:

To the extent Tenant has been in compliance with applicable environmental laws then, notwithstanding the foregoing language in Section 12.b above, Tenant shall not be held liable following the expiration of this Lease term for the following * * * (iii) the removal and disposal of any hazardous waste on the Premises, the presence or use of which hazardous waste has not been caused directly or indirectly by the acts of the Tenant or View-Master Ideal Group, Inc.

⁴Paragraph 27 of the Arbitration Agreement provides:

The Court shall vacate, modify or correct any award: (I) where the arbitrator's findings of fact are not supported by substantial evidence, or (ii) where the arbitrator's conclusions of law are erroneous."

7 - OPINION AND ORDER

May 14, 2003. Both parties appealed to the Ninth Circuit Court of Appeals and, as noted, the case is before me on remand.

DISCUSSION

1. Standard of Review

In Kyocera, the Ninth Circuit held that federal court review of arbitral decisions is limited to the grounds set forth in the Federal Arbitration Act, 9 U.S.C. § 10, and that private parties have no power to alter or expand those grounds by stipulation or agreement. Kyocera, 341 F. 3d at 1000. That ruling formed the basis of the remand in this case. The Ninth Circuit specifically instructed this court to review the original arbitration award under the allowable grounds for vacatur in the FAA. Hall Street Associates, L.L.C. v. Mattel, Inc., 2004 WL 2596020 (9th Cir. 2004).

The parties nonetheless disagree on the standard of review that governs my analysis on remand. Plaintiff contends that the original arbitration award should be vacated because the arbitrator's interpretation of the phrase "applicable environmental law" as excluding the ODWQA is an "implausible interpretation" of the contract. Defendant, in turn, argues that the arbitrator's interpretation is neither "completely irrational" nor in "manifest disregard for the law" and therefore not subject to judicial intervention under the FAA. Therefore, I must first determine what grounds for vacatur are "allowable" under the FAA.

Section 10 of the FAA allows vacatur if (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made. 9

8 - OPINION AND ORDER

U.S.C. § 10. Arbitrators "exceed their powers" when the award is "completely irrational," or exhibits a "manifest disregard of the law." Kyocera, 341 F. 3d at 997-98. In a recent post-Kyocera decision, the Ninth Circuit also confirmed that an arbitrator's "implausible interpretation of [a] contract" can be vacated under the FAA. Theis Research, Inc. v. Brown & Bain, 386 F. 3d 1180, 1185 (9th Cir. 2004) (citing Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh, 933 F.2d 1481 (9th Cir. 1991)), amended on denial of rehearing, 400 F.3d 659 (9th Cir. 2005).

Thus, although Kyocera does not mention the "implausible interpretation" standard, Theis clarifies the Ninth Circuit's position concerning the scope of review of an arbitrator's contract interpretation under the FAA. Several other circuits also apply the "implausible interpretation" standard in FAA cases. See, e.g., Bull HN Information Systems, Inc. v. Hutson, 229 F. 3d 321 (1st. Cir. 2000); Jacada, Ltd. v. International Marketing Strategies, Inc., 401 F. 3d 701 (6th Cir. 2005); George Watts & Sons, Inc. v. Tiffany and Co., 248 F. 3d 577 (7th Cir. 2001); Manion v. Nagin, 392 F. 3d 294 (8th Cir. 2004); Brown v. Coleman Co., Inc., 220 F.3d 1180 (10th Cir. 2000). Because the present dispute requires interpretation of a contract, I apply the "implausible interpretation" standard here.

2. Was the Arbitrator's Interpretation "Plausible"?

The arbitrator's interpretation of the contract must be sustained if it is plausible. Employers Ins., supra, 933 F.2d at 1486 (citing Sheet Metal Workers Int'l Ass'n v. Arizona Mechanical & Stainless, Inc., 863 F. 2d 647, 653 (9th Cir. 1988)). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."

9 - OPINION AND ORDER

United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987); Employers Ins., 933 F.2d at 1486. Because "the parties [have] authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." Employers Ins., 933 F.3d at 1486 (citing United Paperworkers, 484 U.S. at 38).

My task is, therefore, to determine whether the arbitrator's interpretation of the phrase "applicable environmental laws" as excluding the ODWQA was "plausible." Employers Ins., 933 F.2d at 1487. I conclude that it was not.

Neither party seriously disputes that the ODWQA is an "environmental law." Mattel, for example, refers to the ODWQA as an "unrelated environmental law." Mattel's Memorandum of Points and Authorities in Support of Motion for Review and Modification of Arbitration Decisions, 12/16/02, p. 16.

The ODWQA is Oregon's version of the Federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f to 300j-26. See ORS 448.277 (authorizing the Department of Human Services ("DHS") to enter into an agreement with the federal government to administer the SDWA in Oregon). The SDWA is an environmental law. See, e.g., In re Willy, 831 F.2d 545, 546 (5th Cir. 1987) (including the SDWA in a list of "environmental statutes").

The text of the ODWQA directs the DHS to act in accordance with the "goal of the people of the State of Oregon to prevent contamination of Oregon's ground water resource while striving to conserve and restore this resource and to maintain the high quality of Oregon's ground water resource for present and future uses." ORS 448.123(2), 448B.155. The ODWQA is

therefore focused not only on treating water to protect public health but also on protecting ground water as an environmental resource. The ODWQA clearly is an environmental law.

However, the arbitrator reasoned that the ODWQA was not "applicable" within the meaning of the parties' lease because it applies to owners and operators of public water systems and is intended to protect, improve and provide safe drinking water to the public. From this premise the arbitrator determined that the ODWQA is not applicable to the indemnification exception for pollution liability under the lease.

Nothing in the lease supports the arbitrator's finding that the phrase "applicable environmental laws" means anything other than its plain meaning; i.e., the body of environmental law that generally applies to Mattel and with which Mattel's non-compliance could expose Mattel or Hall Street to civil or criminal penalties. As Hall Street explained in its recently filed objections to the original arbitration award:

> It is undisputed that Mattel failed to test the water on the Property for the presence of contaminants at any time during its twenty-year period of occupancy. The Arbitrator so found, (½/02 Findings of Fact ("FF"), ¶ 24) ("During the period 1981-1998, View-Master, Tyco, and Mattel did not test the well water, groundwater, or shallow soils for contaminants."), and Mattel's counsel expressly acknowledged the fact in his closing argument at the arbitration. * * * ("[I]s Mattel proud of the fact that they didn't test the water? . . . Absolutely not."). Indeed, the TCE contamination was only discovered after Hall Street commissioned SECOR to test the wall water in 1998. (½/02 FF, ¶ 25.) When the well was finally tested, it "showed TCE concentrations ranging from 1220 to 1520 micrograms per liter (ug/L). The Federal Drinking Water Standard for TCE is 5 ug/L."
> * * * Mattel has never contested the fact, nor could they, that their failure to test the water at the site constituted a violation of the Oregon Drinking Water Quality Act.

Hall Street's Objections to Confirmation of Original Arbitration Award on Remand, 3/25/05, p. 4 (certain citations omitted). A twenty-year violation of the ODWQA carries a potential exposure

of $3,650,000 of civil penalties under ORS 448.280 which provides, as relevant, a penalty of up to $500 for each day of violation.

I find Hall Street's contention valid that the parties contemplated compliance with *all* environmental laws affecting this property at the formation of the lease, including those meant to protect public health, and that Mattel should have understood that it not only had to refrain from further contaminating the property, it also had to ensure that the public was protected from any pre-existing contamination in order to trigger the indemnification exception to pollution liability.

The arbitrator cited no particular provision in the lease to support the plausibility of his reasoning. Indeed, no law would qualify as an "applicable environmental law" under the arbitrator's reasoning because no environmental statute is designed to protect property owners from property damage; the purpose of such statutes is to protect the environment and human health. Nothing in the lease supports the arbitrator's finding that the parties did not consider the ODWQA to be an "applicable environmental law" at the time of formation. Therefore, the January 2, 2002, original arbitration award is VACATED.

This brings me to the question of how to proceed. On remand of the original arbitration decision in April 2002, I directed the arbitrator to consider the ODWQA to be an applicable environmental law. The arbitrator did so, and issued an amended arbitration decision generally favoring Hall Street, followed by a Final Arbitration Award. Both parties challenged the second award, and in May 2003, I issued an opinion adopting in part and reversing in part the arbitrator's decision and entered judgment accordingly.

12 - OPINION AND ORDER

Now, as then, my resolution of the currently pending issue requires no further action by the arbitrator. Therefore, I enter judgment in accordance with my Opinion and Order filed on May 1, 2003.

IT IS SO ORDERED.

DATED this 29th day of June, 2005.

_____
ROBERT E. JONES
U.S. District Judge